UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BAYBUTT CONSTRUCTION CORPORATION, )<br>Plaintiff )<br> )<br>v. )<br> )<br>J. STEWART ROBERTS ASSOCIATES, INC. )<br>Defendant )<br> ) | No. 04-10870-MLW |

**OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

The plaintiff Baybutt Construction Corporation ("Baybutt") opposes

defendant J. Stewart Roberts Associates, Inc.'s ("JSR") motion for summary

judgment, stating as follows:

I.       Statement of Disputed Material Facts

Baybutt concedes that the items (1-9) listed in JSR's Memorandum at 3-4

as Undisputed Material Facts are all accurate statements of fact.  As a matter of

law, however, they do not support summary judgment.  Moreover, the following

facts material to the motion *are* disputed:

1)  In early fall 2003, it was discovered that B.E.R. (JSR's subcontractor)
had improperly designed the control panel for the fire pump system, by
failing to locate it within sight of the fire pump vault, and with an integral
automated transfer switch, as required by NFPA 20.  The waiting time for
answers from JSR/B.E.R. and the time needed to acquire and install all
necessary components all caused delay to substantial completion of the
project beyond early fall of 2003.  Redesign and authorization to proceed
was provided by JSR many weeks after Baybutt sought same, in violation

of M.G.L. ch. 30, § 39P, and Baybutt and its own subs ultimately had to take the lead with respect to a redesign.

2)  In some areas of the building there have been regular leaks after significant rain events (water runs down the face of the precast and face of the brick, and filters through into the room) despite Baybutt's having followed the design initially furnished by JSR (which did not include a thru wall flashing detail for this area, and despite numerous efforts to install thru wall flashing afterwards (see Exhibit 26 to O'Brien deposition), and to seal and waterproof the area.  Boxford has conceded that the leaks in Room 106 and the heating imbalances will now be the subject of change orders, to be paid for on a time and materials basis.

3)  The design furnished by JSR for the ventilation system and ductwork was followed by Baybutt's mechanical subcontractor Thomas E. Snowden, Inc., but heating imbalances nevertheless occurred.   Two residential grade air handling units were approved for installation; however, commercial grade is required.  Phil O'Brien of JSR suggested that the RPM's on the motor be "cranked up" to compensate, but Snowden, Baybutt's mechanical sub, informed Baybutt that this will not work. Phil O'Brien of JSR directed Snowden, Baybutt's mechanical sub, to make longer runs and bends in its ductwork in order to avoid beams and coiling doors, even though Snowden declined to guaranty that this would work.

4)  In the spring of 2003 Baybutt discovered that the detail furnished by JSR's plans for connecting precast cornices to the building were insufficiently strong to work, as a result of which Baybutt was required to design and install stronger connections.

5)  Boxford has confessed judgment in favor of Baybutt in the amount of $263,000 for extra costs incurred by Baybutt resulting from the misdesign of the fire pump, misdesign of precast connections and various other items – all of which are conceded by Boxford to entitle Baybutt to additional compensation.

All of these facts are verified by Baybutt's sworn interrogatory answers, a true copy of which is appended as Exhibit A hereto.  All must be viewed in the light most favorable to Baybutt for purposes of the pending summary judgment motion. Nicolo v. Philip Morris, Inc., 201 F.3d 29, 33 (1st Cir. 2000).

II.    Argument

A.    The "Economic Loss Doctrine" is No Bar to Baybutt's
       Negligence Counts

Count I (Negligence in Design) and Count II (Negligence and/or Bad Faith

in Contract Administration) are the tort counts brought by Baybutt.  While some

Massachusetts cases do indeed say that purely economic loss is not recoverable in

a negligence case (except, as JSR concedes, for negligent misrepresentations), the

economic loss rule proves, on close scrutiny, not to be so broad.

"Though the economic loss rule is frequently invoked, it is ordinarily with

sparse analysis or explanation.  Thus, there is a lack of clarity and precision

regarding the doctrine's application, purpose and rationale."  Sofi Classic S.A. v.

Hurowitz, 444 F.Supp 2d 231, 246 n.7 (S.D.N.Y. 2006).  Baybutt begs the Court's

indulgence in allowing Baybutt to provide some clarity and precision here, even

though we must of necessity wax jurisprudential in order to do so:

1.    Products Cases, Not Service Cases, Are Appropriate Ones for
       Application of the Economic Loss Rule

The economic loss rule was born and grew up in the products liability

context.  Hydro Investors, Inc. v. Trafalgar Power, Inc., 227 F.3d 8, 16 (2d Cir.

2000) ("The rule developed as a way of enforcing the dictates of privity in product

liability law and preventing tort remedies from eliminating the customary

limitations involved in cases addressing the sale of goods").  While products cases

3

are not the only ones in which the economic loss rule is applied, they do constitute

the overwhelming majority.  Many states explicitly or implicitly restrict the rule to

products cases.  These include California, <u>Jimenez v. Super. Court</u>, 29 Cal. 4th

473, 483, 58 P.3d 450, 456 (Cal. 2002) (limiting the rule to cases involving "strict

products liability . . . when a product defect causes damage" to the product itself);

Florida, <u>Moransais v. Heathman</u>, 744 So. 2d 973, 983 (Fla. 1999) (stating that "the

rule was primarily intended to limit actions in the product liability context, and its

application should generally be limited to those contexts or situations where the

policy considerations are substantially identical to those underlying the product

liability-type analysis. . . The rule, in any case, should not be invoked to bar well-

established causes of actions in tort, such as professional malpractice"); Georgia,

<u>Advanced Drainage Systems, Inc. v. Lowman</u>, 210 Ga.App. 731, 733, 437 S.E.2d

604 (1993) (stating that "[t]he economic loss rule provides that absent personal

injury or damage to property other than to the allegedly defective product itself an

action in negligence does not lie and any such cause of action may be brought only

as a contract warranty action"); Hawaii, <u>State ex rel. Bronster v. U.S. Steel Corp.</u>,

82 Haw. 32, 919 P.2d 294, 302 (1996) (adopting the rule "insofar as it applies to

claims for relief based on a product liability or negligent design and/or

manufacture theory"); Maryland, <u>Morris v. Osmose Wood Preserving</u>, 340 Md.

519, 667 A.2d 624, 632-33 (1995) (characterizing the rule as a products liability

rule); Michigan, <u>Neibarger v. Universal Coops., Inc.</u>, 439 Mich. 512, 520, 486

N.W.2d 612, 615 (1992) (limiting the rule to "transactions involving the sale of

goods for commercial purposes where economic expectations are protected by commercial and contract law"); Minnesota, <u>McCarthy Well Co. v. St. Peter Creamery, Inc.</u>, 410 N.W.2d 312, 315 (Minn. 1987) (the economic loss rule does not apply "if the predominant purpose of the contract is the rendition of services"); South Carolina, <u>Beachwalk Villas Condo. Ass'n v. Martin</u>, 305 S.C. 144, 406 S.E.2d 372, 374 n.1 (1991) (the rule applies only to product defect cases in which the "duties are created solely by contract"); South Dakota, <u>Diamond Surface, Inc. v. State Cement Plant Comm'n</u>, 583 N.W.2d 155, 161 (S.D. 1998) (the rule applies when the "predominate purpose" of a transaction is the "sale of goods"); Wisconsin, <u>Ins. Co. of North America v. Cease Elec. Inc.</u>, 276 Wis. 2d 361, 688 N.W.2d 462, 472 (2004) ("the economic loss doctrine is inapplicable to claims for the negligent provision of services"). As stated in <u>Indemnity Insurance Co. of North America v. American Aviation, Inc.</u>, 344 F.3d 1136, 1141 (11th Cir. 2003) (quoting from <u>Moransis</u>, supra):

> [B]y recognizing that the economic loss rule may have some genuine, but limited, value in our damages law, we never intended to bar well-established common law causes of action, such as those for neglect in providing professional services. Rather, the rule was primarily intended to limit actions in the product liability context, and its application should generally be limited to those contexts or situations where the policy considerations are substantially identical to those underlying the product liability-type analysis.

Why should this be so? Unlike a sale of a product which can reach many unforeseeable users in the stream of commerce, a service is generally furnished to one customer with the expectation that it will affect comparatively few others not

in privity with the furnisher. Design services, and contract administration

services, are quintessential examples of this. The specter of unlimited liability that

attends economic loss recovery in the products context is not present here.

Further protection against unlimited liability is provided by restricting the

class of potential plaintiffs to those who will be foreseeably affected by a

professional's negligence. As long as the potential plaintiff who will be harmed is

identifiable in advance, this concern is met despite lack of privity. Rae v. Air-

Speed Inc., 386 Mass. 187, 193 (1982) ("This court has also allowed recovery for

the negligent furnishing of services to one not a party to the contract where the

defendant knew that the plaintiff would rely on his services.").

Thus, Section 552(2) of the Restatement (Second), Torts, limits liability to

loss suffered "(a) by the person or one of a limited group of persons for whose

benefit and guidance he intends to supply the information *or knows that the*

*recipient intends to supply it*." Comment h adds:

> It is enough that the maker of the representation intends it to
> reach and influence either a particular person or persons, known to
> him, or a group or class of persons, distinct from the much larger
> class who might reasonably be expected sooner or later to have
> access to the information and foreseeability to take some action in
> reliance upon it . . . It is sufficient, in other words, insofar as the
> plaintiff's identity is concerned, that the maker supplies the
> information for repetition to a certain group or class of persons and
> that the plaintiff proves to be one of them, even though the maker
> never had heard of him by name when the information was given.

JSR surely knew that the recipient of its design – the Town of Boxford –

intended to supply it to the successfully bidding general contractor (which is

Baybutt here).  Under <u>Rae</u>, that is enough to hold it liable to Baybutt.  Unlimited

liability is not threatened here, as it would be in a products case – so the service

negligently provided by JSR therefore ought not trigger the economic loss rule.


      2)      <u>The Role of Contract Remedies in the Economic Loss Doctrine</u>

Even if (as is true in some jurisdictions) the economic loss doctrine applies

in services as well as in products cases, it must be limited to instances in which the

plaintiff otherwise is in privity of contract with defendant, and hence able to avail

itself of a contract remedy.  To understand why, the different goals of contract law

and tort law must be considered.

Contract law enforces the expectancy interests between contracting parties

and provides redress for parties who fail to receive the benefit of their bargain.  Its

focus is on standards of quality as defined by the parties in their contract. Tort law,

in contrast, evaluates the reasonableness of a person's conduct and compensates

victims for their actual harm resulting from that conduct, whenever a duty is

identified as running from tortfeasor to a foreseeably injured victim.

<u>East River S.S. Corp. v. Transamerica Delaval, Inc.</u>, 476 U.S. 858 (1986),

is the leading case on this point.  It distinguished the policies undergirding tort law

and contract law, and elaborated on contract law's goal of compensating a

contractual party for injuries experienced due to a breach of a duty created in an

express or implied contractual relationship. The Court noted the importance of

preventing "contract law [from] drown[ing] in a sea of tort," <u>id.</u> at 866, and

cautioned that "[p]ermitting recovery for all foreseeable claims for purely economic loss could make a manufacturer liable for vast sums. It would be difficult for a manufacturer to take into account the expectations of persons downstream who may encounter its product." Id. at 874.   As Justice Breyer recently characterized the rationale of East River, "[g]iven the availability of warranties, the courts should not ask tort law to perform a job that contract law might perform better." Saratoga Fishing Co. v. J.M. Martinac Co., 520 U.S. 875, 880 (1997).

See also Mt. Lebanon Personal Care Home, Inc. v. Hoover Universal, Inc., 276 F.3d 845 (6th Cir. 2002) ("Three policies support applying the economic loss doctrine to commercial transactions: (1) it maintains the historical distinction between tort and contract law; (2) it protects parties' freedom to allocate economic risk by contract; and (3) it encourages the party best situated to assess the risk of economic loss, usually the purchaser, to assume, allocate, or insure against that risk."); Jordan v. Case Corp., 26 Kan. App.2d 742, 744, 993 P.2d 650 (1999) (same); Moore v. Coachmen Indus., Inc., 129 N.C.App. 389, 401-02, 499 S.E.2d 772, 780 (1998) ("The rationale for the economic loss rule is that the sale of goods is accomplished by contract and the parties are free to include, or exclude, provisions as to the parties' respective rights and remedies, should the product prove to be defective").

Given this rationale, what happens if (as is true here) a contract remedy is unavailable to the injured party?  Baybutt is, after all, not in privity of contract

with JSR, so Baybutt obviously would have no direct contract remedy for any negligence in design or administration. The ability to protect itself by contract and deal with the risks of nonperformance through that contract is the very basis for application of the economic loss rule.  With rationale for the rule disappears, so should the rule.  Trinity Lutheran Church v. Dorschner Excavating, Inc., 289 Wis. 2d 252, 710 N.W.2d 680, 686 (2006), puts it succinctly:

> It may well be that, where parties are linked to each other by contract, the economic loss doctrine may be invoked to avoid drowning contract law in "a sea of tort."  Linden, 283 Wis. 2d 606, P7. However, when there is no contractual relationship of any kind between two parties, it is equally important to prevent an allegedly injured party from "falling between the stools of tort and contract." *See* Miller v. U.S. Steel Corp., 902 F.2d 573, 575 (7th Cir. 1990).

Justice Breyer, writing for the majority in Saratoga, *supra* at 881-82, had a similar observation regarding application of East River to parties not in privity:

> [W]hy should a series of resales, after replacement and additions of ever more physical items, progressively immunize a manufacturer to an ever greater extent from the liability for foreseeable physical damage that would otherwise fall upon it?
>
> The East River answer to this question - because the parties can contract for appropriate sharing of the risks of harm - is not as satisfactory in the context of resale after an initial use. That is because, as other courts have suggested, the Subsequent User does not contract directly with the Manufacturer (or distributor.)

Seen in this light, it becomes apparent that simply stating that tort recovery for economic loss is prohibited is an oversimplification.  In Town of Alma v. Azco Constr., Inc., 10 P.3d 1256, 1262-63 (Colo.2000), the Colorado Supreme Court

observed that a more accurate indicator of whether an action is appropriate in tort

is the source of the duty upon which the tort claim is premised:

> The key to determining the availability of a contract or tort action lies in determining the source of the duty that forms the basis of the action. We find the following discussion by the South Carolina Supreme Court informative:
> The question, thus, is not whether the damages are physical or economic. Rather the question of whether the plaintiff may maintain an action in tort for purely economic loss turns on the determination of the source of the duty [the] plaintiff claims the defendant owed. A breach of a duty which arises under the provisions of a contract between the parties must be redressed under contract, and a tort action will not lie. A breach of a duty *arising independently* of any contract duties between the parties, however, may support a tort action. [quoting *Tommy L. Griffin Plumbing & Heating Co. v. Jordan, Jones & Goulding, Inc.*, 320 S.C. 49, 463 S.E.2d 85, 88 (1995)]

The SJC has also recognized that "[w]hen the economic loss rule has been applied,

the parties usually were in a position to bargain freely concerning the allocation of

risk."  Clark v. Rowe, 428 Mass. 339, 342 (1998).  *But that is not the case here.*

Applying the economic loss rule where a party cannot protect itself by

contract would turn the rule on its head, and sever it from its roots.  In Indemnity

Insurance Co. of North America v. American Aviation, Inc., 891 So. 2d 532, 536

(Fla. 2004), the court expressly limited the application of the economic loss rule to

two different circumstances:

> The first is when the parties are in contractual privity and the one party seeks to recover damages in tort for matters arising under the contract. The second is when there is a defect in the product that causes damage to the product but causes no personal injury or damage to other property.

Justice Canterro, in his concurrence, elaborated further:

When parties can protect their economic interests through contract, it would only undermine contract and warranty law and produce economic inefficiency to allow purely economic recovery in tort. See Alloway v. Gen. Marine Indus., L.P., 149 N.J. 620, 695 A.2d 264, 275 (N.J. 1997) ("[A] tort cause of action for economic loss duplicating the [causes of action] provided by the U.C.C. is superfluous and counterproductive."). It is doubtful, however, that parties can protect their economic interests through contract when they have not contracted with each other and when the basis of their indirect relationship is not a tangible product, but rather an intangible service. See Congregation of the Passion, Holy Cross Province v. Touche Ross & Co., 159 Ill. 2d 137, 636 N.E.2d 503, 515, 201 Ill. Dec. 71 (Ill. 1994) ("The characteristics of a tangible object are readily ascertainable, and they can be memorialized in a contract and studied by the parties. . . . It is not necessary or generally possible to memorialize all the elements of [a service] contract. . . . Application of the [economic loss rule], therefore, is inappropriate where a relationship results in something intangible."). In such circumstances, the parties often lack a sufficient nexus through which to allocate economic risks.

See also Robinson Helicopter Co., Inc. v. Dana Corp., 34 Cal.4th 979, 22 Cal.Rptr.3d 352, 361, 102 P.3d 268, 275 (2004) ("A breach of contract remedy assumes that the parties to the contract can negotiate the risk of loss occasioned by a breach"); Bilt-Rite Contractors, Inc., v. The Architectural Studio, 581 Pa. 454, 483, 866 A.2d 270, 288 (2005) ("a plaintiff is not barred from recovering economic losses simply because the action sounds in tort rather than contract law.  Here, Bilt-Rite has no contractual relation with TAS; thus, recovery under a contract is not available").

The inability to allocate economic risks by contract is glaring in this case.  Not only did Baybutt have no contract with JSR; Baybutt had no ability to adjust or negotiate its contract with *the Town* to provide for

recovery of its economic losses flowing from the architect's negligence in design or in contract administration.  Just as in cases of personal injury and property damage –  acknowledged areas in which the economic loss rule does not have sway – there was no meaningful opportunity for the victim to secure itself a *contract* remedy for any economic loss, and therefore there is no contract remedy to be undermined by the application of tort principles. *The rationale for the economic loss rule disappears in such a case.*[1]

### 3)  Applying the Misrepresentation Exception

Misrepresentation by a professional is acknowledged to be an exception to the economic loss rule in Massachusetts, as elsewhere.  JSR itself cites to Nota Constr. Corp. v. Keyes Assocs., 45 Mass. App. Ct. 15, 694 N.E.2d 401 (Mass. App. Ct. 1998), which involved a subcontractor who bid a school project based upon plans and specifications prepared by an architect retained by the school district.  In the plans, the architect made certain representations regarding the area surrounding the septic system.  Nota sued the architect for its economic losses directly caused by its reliance on the architect's plans and specifications.  The architect argued that the action was barred by the economic loss doctrine and that it could not be held liable for negligent misrepresentation because a design

---

[1] In a sense, the law is now coming full circle.  In the 19th century, "economic loss" was actually *defined* as the loss of an expectancy that is created by contract!  Barrett, *Recovery of Economic Loss in Tort for Construction Defects: A Critical Analysis*, 40 SC L Rev 891, 895-901 (1989).  Over 100 years of loose usage, by numerous judicial opinions eschewing probing analysis, has unfortunately given the notion a broader spin.

professional is not in the business of supplying specific information to others to

induce action. Rejecting both arguments, the Appeals Court held that economic

losses resulting from negligent misrepresentation are an exception to the economic

loss doctrine.  Id. at 405 (*citing* Craig v. Everett M. Brooks Co., 351 Mass. 497,

222 N.E.2d 752 (Mass. 1967)). On the second issue, the court held that design

professionals who negligently furnish services to another are liable in tort where

they have reason to know that the plaintiff will be relying upon their work product:

> The Supreme Judicial Court [of Massachusetts] has held that liability
> will be imposed in Massachusetts for the negligent furnishing of
> services to one not a party to the contract where the defendant knows
> that the party will rely on his services. ... Accordingly, we see no
> reason why a design professional such as an architect should be
> exempt from liability for negligent misrepresentation to one where
> there is no privity of contract. This view is in accord with a number
> of other jurisdictions.

Id. at 405-06 (footnote and citations omitted) (collecting cases).

Implicit in this holding is the assumption that the furnishing of a defective

design is *automatically* a misrepresentation.  What else could it be?  The law is

clear that a designer implicitly warrants the sufficiency of its design; *see* United

States v. Spearin, 248 U.S. 132, 136 (1918); Alpert v. Commonwealth, 357 Mass.

306, 320 (1970) ("where one party furnishes plans and specifications for a

contractor to follow in a construction job, and the contractor in good faith relies

thereon, the party furnishing such plans impliedly warrants their sufficiency for

the purpose intended").

The cases are legion allowing negligent misrepresentation claims against architects or engineers for economic loss in the absence of privity, based purely on the furnishing of inadequate designs themselves, unaccompanied by any separate representation as to their adequacy.  See, e.g., <u>Donnelly Construction Co. v. Oberg/Hunt/Gilleland</u>, 139 Ariz. 184, 166-89, 677 P.2d 1292, 1296-97 (1984) (a contractor who reasonably and foreseeably relies upon defective plans can bring negligence and implied warranty claims against the architect who prepared them despite lack of privity); <u>United States v. Rogers & Rogers</u>, 161 F.Supp. 132, 135-36 (S.D.Cal.1958) (holding that a general contractor could recover from an architect for negligent supervision of project that resulted in economic loss); <u>Gulf Contracting v. Bibb County</u>, 795 F.2d 980, 982 (11th Cir. 1986) (per curiam) (applying Georgia law); <u>Village of Cross Keys, Inc. v. United States Gypsum Co.</u>, 315 Md. 741, 556 A.2d 1126, 1133-35 (Md. 1989); <u>Reliance Ins. Co. v. Morris Assocs., P.C.</u>, 200 A.D.2d 728, 607 N.Y.S.2d 106 (1994) (affirming lower court's denial of defendant design professional's motion to dismiss complaint as to counts of negligence and professional malpractice asserted by contractor, notwithstanding absence of privity); <u>Davidson and Jones, Inc. v. County of New Hanover</u>, 41 N.C. App. 661, 667, 255 S.E.2d 580, 584, *cert. denied,* 298 N.C. 295, 259 S.E.2d 911 (1979) ("We hold that an architect in the absence of privity of contract may be sued by a general contractor or the subcontractors working on a construction project for economic loss foreseeably resulting from breach of an architect's common law duty of due care in the performance of his contract with the owner");

John Martin Co. v. Morse/Diesel, Inc., 819 S.W.2d 428, 432-34 (Tenn. 1991);

Eastern Steel Constructors, Inc. v. City of Salem, 209 W. Va. 392, 549 S.E.2d 266,

276 (2001) ("a contractor may indeed maintain a cause of action for negligence

seeking purely economic damages against a design professional where there is no

privity of contract between the two"); Forte Bros., Inc. v. National Amusements,

Inc., 525 A.2d 1301, 1303 (R.I. 1987) ("a contractor can maintain a negligence

action against an architect without direct privity of contract between the parties");

Boren v. Thompson & Associates, 999 P.2d 438 (Okla. 2000); W.H. Lyman

Constr. Co. v. Village of Gurnee, 84 Ill. App.3d 28, 38 Ill.Dec. 721, 403 N.E.2d

1325, 1333-34 (1980).

     In Loenco v. Town of Londonderry, No.CV 95-455-M (D.N.H. 1995), New

Hampshire's federal court held that an engineer hired by a town was liable to a

contractor in tort, for economic loss, without privity, for erroneous information it

had furnished.  The court referenced the Restatement (Second)'s negligent

misrepresentation section, but without mentioning any representation aside from

the plans and specs themselves:

> Under New Hampshire law, economic damages are not ordinarily
> available in a negligence case. See Border Brook Terrace Condo.
> Assoc. v. Gladstone , 137 N.H. 11, 18 (1993). New Hampshire does,
> however, recognize an exception to that general rule when
> professionals supply erroneous information, causing reasonably
> foreseeable injury to a third party. . . Ultimately, holding HTA liable
> for losses caused by false or inaccurate information contained in the
> project's plans and specifications is consistent with prior New
> Hampshire case law, the Restatement (Second) of Torts § 552, and
> the decisions of many other courts which have addressed this issue.

According to Feinman, <u>Economic Negligence in Construction Litigation</u>,

15-AUG Construction Law 34, 34-35 (1995):

> Most courts have extended liability to design professionals by
> bringing this area within the ordinary law of negligence. In all of the
> elements of the design professional's role -- design, supervision, and
> evaluation -- failure to observe a reasonable standard of care may
> foreseeably cause economic harm to another participant in the
> construction process or to a user of the property.  When that occurs,
> the design professional ordinarily is held liable for the economic
> consequences of its negligence.

So should it be here.  Whether or not one characterizes these cases as negligent

misrepresentation cases, or simply as negligent design cases, is immaterial;

furnishing the design is *ipso facto* the making of a representation as to adequacy of

that design.  Baybutt's claim is thus well within the negligent misrepresentation

exception to the economic loss rule that JSR concedes exists, even though Baybutt

can point to no separate representation of adequacy apart from the design itself.

   4)  <u>Palco Linings, Inc. v. Pavex, Inc.</u>

JSR's Memorandum devotes significant ink to the <u>Palco</u> case, a 1990

district court decision from the Middle District of Pennsylvania.  <u>Palco</u> was

recently disapproved by the Supreme Court of Pennsylvania in <u>Bilt-Rite</u>

<u>Contractors, Inc. v. The Architectural Studio</u>, 581 Pa. 454, 866 A.2d 270 (2005).

As it is no longer good law even in its own jurisdiction, Baybutt urges this Court

not to follow <u>Palco</u>.

5)  Conclusion

While the economic loss doctrine is not an easy one to parse, careful analysis of its purpose and underpinnings reveals that it is inapplicable to our facts – a professional service rather than a product; a plaintiff without a contract remedy against the wrongdoer; and a misrepresentation inherent in defective plans and specifications foreseeably relied upon by that plaintiff.

B.    The Town *Did* Have Indemnity Claims to Assign to Baybutt

JSR next asserts that the Town of Boxford had no indemnity rights to assign to Baybutt, whether express or implied, and therefore the purported assignment of claims fails.  Not so.

JSR selectively reads its own contract with the Town of Boxford when it asserts that "[t]he only indemnity provision that appears in the contract between JSR and the Town states as follows: 'The Architect shall defend, indemnify and hold Owner harmless from any claims, costs or expenses on account of bodily injury or property damage which are the result of the Architect's negligence . . .'" Memorandum at 12-13.  JSR forgets to mention Addendum Subparagraphs 1.2.3.6 and 1.3.7.10 from its own **Exhibit A**:

> "The Construction Documents shall comply with all applicable laws, statutes, ordinances, by-laws, codes, rules and regulations. . . The Architect shall be responsible for the professional and technical accuracy and the coordination of all designs, drawings, specifications, estimates and other work furnished by him or his consultants and subcontractors, in accordance with generally accepted standards of professional practice."

17

"Any defective design or specifications furnished by the Architect shall be promptly corrected by the Architect at no cost to the Owner, and the Architect will promptly reimburse the Owner for all damages, if any, resulting from the use of such defective designs or specifications."

This language is unambiguously indemnity language, regardless of failure to use the word "indemnify."  The rule that indemnity agreements are to be strictly construed against the indemnitee is not followed in Massachusetts, *see* Herson v. New Boston Garden Corp*.,* 40 Mass.App.Ct. 779, 782 (1996) ("[i]ndemnifcation provisions are to be read without any bias for the indemnitor or against the indemnitee").  Rather, indemnity provisions "are to be fairly and reasonably construed to ascertain the intention of the parties and to effectuate the purpose sought to be accomplished." Urban Inv. & Dev. Co. v. Turner Constr. Co., 35 Mass. App. Ct. 100, 107 (1993).  The language must be applied in accordance with its ordinary meaning here.

Moreover, wholly apart from the foregoing indemnification clause, the Town has common law indemnity rights against JSR for all of the Town's liability which results from its agent JSR's breach of contract.  JSR is simply wrong in asserting, Memorandum at 13, that only personal injury tort actions can spawn common law indemnity obligations.  Indeed, common law implied indemnity obligations can exist side-by-side with express indemnity clauses.  *See*, e.g., Perseus of N.E., MA, Inc. v. Commonwealth, 429 Mass. 163, 167 (1999) ("Even absent the indemnification provision, Perseus would have a breach of contract claim against the county for its failure to pay the Medicaid liability it incurred.

18

The proper remedy for Perseus's claim would be indemnification, a fact not altered by the indemnification clause").

Lastly, JSR's reference to M.G.L. ch. 231B as rendering *contribution* unavailable in the absence of bodily injury or property damage, Memorandum at 13-14, is simply off-point.  This is an indemnity case, not a contribution case, and it arises from contract, not tort.  "Discharge of liability for contribution under M.G.L. ch. 231B, § 4 does not extinguish any right of indemnity."  Chapman v. Bernard's, Inc., 198 F.R.D. 575 (D.Mass. 2001).


    C.    There is No "Sham Judgment" Against the Town

In Spellman v. Shawmut Woodworking & Supply, Inc., 445 Mass. 675, 676 (2006), the SJC considered "the validity and enforceability of an assignment of a general contractor's claims (for contractual indemnification and breach of contract) against its subcontractor to an employee of the subcontractor who was injured on the job."  There, as here, the assignor had confessed judgment to the assignee.  There, as here, the plaintiffs agreed to "seek satisfaction of the [agreement for judgment] solely from the proceeds of [assignor's] claims or rights assigned to the Plaintiffs ... and that they will not collect or seek to collect any or all of the [agreement for judgment] from [assignor]."  Id. at 678.  And there, as here, defendant argued that "by reason of the plaintiffs' agreement in the assignment not to collect the settlement amount from [assignor], [assignor] has not

incurred an actual loss and, as a consequence, the [judgment] amount is illusory."

Id. at 679.  In ruling that the assignment was valid and enforceable, the SJC stated:

> With respect to the agreement for judgment and the covenant in the
> assignment not to pursue satisfaction of the agreement, we have held
> (following the majority rule), admittedly in different circumstances,
> that such devices do not operate to invalidate an otherwise valid
> assignment. See *Campione v. Wilson,* 422 Mass. 185, 190-192
> (1996), and cases cited. This is so even where the assignee (here,
> Shawmut) suffers no tangible damages. *Id.* at 189-190.
>
> As in the *Campione* decision, we do not overlook the possibility
> of collusion or fraud. These risks, however, are mitigated by
> "[p]lacing with the plaintiffs the responsibility of proving their
> assigned claims in full," as well as damages, and by permitting
> defendants, such as East Coast, "to suggest the issue of collusion,
> and if a satisfactory basis exists, to argue it to the fact finder." *Id.* at
> 193.  The risk of fraud and collusion also is offset by important
> policy considerations such as encouraging settlement agreements,
> see *Polaroid Corp. v. Travelers Indem. Co.,* 414 Mass. 747, 765
> (1993); by settled law that most contract claims are assignable, see
> *Rubenstein v. Royal Ins. Co.,* 45 Mass.App.Ct. 244, 246 (1998); by
> settled law that contracts not to sue (or, by analogy, contracts not to
> satisfy judgments) are usually valid, see 29 S. Williston, Contracts §
> 73:5 (4th ed.2003); and by a permissible objective on the part of a
> general contractor to shift the financial consequences of risks arising
> in the performance of a construction contract to another entity (an
> entity that can protect against such risks by obtaining insurance, a
> measure Shawmut contends that East Coast was obligated, but
> failed, to do), see *Collins v. Kiewit Constr. Co., supra* at 800 (noting
> parties may negotiate indemnity clauses and may "adjust to any
> unequal bargaining power by the assumption of the burdens of
> insurance coverage").

Id. at 681-82.  There is no basis in logic to distinguish our case from Spellman.

Baybutt still has to prove that JSR breached its contractual obligation to the Town,

and cannot rely solely on the Town's admission of liability (although at trial, the

Town will support Baybutt's position).  "By upholding the assignment, the

plaintiffs step into the shoes of [the Town] and may assert against [JSR] only those claims that [the Town] had against [JSR], namely claims for contractual indemnification and breach of contract. . . The assignment does not change [JSR's] potential exposure; it only affects the party to whom payment must be made if liability and damages are proved."  Id. at 682.

This Court should similarly uphold the validity and enforceability of the Settlement and Assignment Agreement between Baybutt and the Town here, and allow Baybutt to stand in the shoes of the Town with respect to this breach of contract claim.[2]

[While it may be immaterial, Baybutt notes that any argument *against* the assignability of the contract remedy here would only underscore Baybutt's point on the economic loss rule's inapplicability where the injured party cannot protect itself with a contract remedy.]

D.    The Statute of Limitations is No Bar to Enforcement by Baybutt of the Assigned Contract Claim Against JSR.

JSR argues that because the Town had not already sued it at the time of the assignment of rights to Baybutt, there is no "relation back" sufficient to save

---

[2] JSR's argument, Memorandum at 15, that "'Actual damage or injury' is an essential element *of a tort case*" is thus a moot point.  In a contract case, even the conditional liability suffices to support the assigned cause of action.  See, e.g., Interstate Contracting Corp. v. City of Dallas, 407 F.3d 708, 713 (5th Cir. 2005) ("Conditional liability as expressed in a subcontract, liquidating agreement, or some other type of claims-presentment arrangement is sufficient to prove liability, even when the agreement provides that the contractor has no obligation to pay the subcontractor unless and until it recovers from the owner.")

Baybutt's claim from the statute of limitations.  It is difficult to know where to begin to address this contention, so – in no particular order – (a) the lack of a pre-assignment claim by the Town is irrelevant; (b) no "relation back" is needed anyway; (c) the applicable statute of limitations is six years, not three; and (d) even if it were three years, the contract sued upon starts the clock ticking only at discovery of breach by the Town (which occurred less than three years prior to the filing of the Amended Complaint).

A negligence claim is governed by a three year statute; a contract claim by a six year statute.  The Amended Complaint clearly pleads a contract claim – one obtained by virtue of assignment from the Town.  As Paragraph 40 of Baybutt's Amended Complaint recites, JSR's <u>contract</u> with the Town obliged it to "use that degree of care and skill ordinarily exercised under similar circumstances by competent members of the design profession practicing in Massachusetts."  JSR is correct that this language "nearly mirrors the legal standard of care of architects," Memorandum at 15 – but that doesn't make the claim a tort claim.  <u>JSR</u> drafted the contract sued upon, and chose to insert this very language in Subparagraph 1.2.3.2 to describe its contractual duty to the Town!

In any event, a three year statute would not help JSR here.  The Amended Complaint was filed on July 5, 2006, and the Town's cause of action against JSR for breach of contract (now assigned to Baybutt) accrued *after* July 5, 2003.  With one exception (improperly designed precast cornice connections), none of the claims made by Baybutt against the Town for additional compensation due to

negligent design or contract administration predated July 5, 2003 – and even as to

that one exception, JSR is estopped to assert that the Town's cause of action

accrued at the time of Baybutt's claim because JSR itself, acting for the Town,

rejected Baybutt's proposed change order (*see* **Exhibit B** attached).  Given JSR's

conclusion in that regard, the Town could hardly have been expected to discover

the defect in JSR's precast cornice connection design until *after* July 5, 2003.


CONCLUSION

The Motion for Summary Judgment should be denied, except as to the

cause of action under M.G.L. ch. 30, § 39J, which Baybutt does not oppose.

> Respectfully submitted,
>
> Baybutt Construction Corporation
> By its attorney,
>
>
>  /s/ Frank P. Spinella, Jr.
> Frank P. Spinella, Jr. #BBO566536
> HALL, MORSE, ANDERSON,
> MILLER & SPINELLA, P.C.
> 14 Centre Street, P. O. Box 2289
> Concord, NH 03302-2289
> (603) 225-6655

Date:  December 20, 2006


CERTIFICATE OF SERVICE

I certify that a copy of the within Opposition has been served electronically on
Jeffrey Alitz, Esq., counsel for defendant.


/s/ Frank P. Spinella, Jr.